**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING**

**LESLIE A. ASHBY,**

        **Plaintiff,**

**v.**                                    **Civil Action No.: 5:11-CV-8**
                                            **JUDGE STAMP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [13], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [16], AND AFFIRM THE RULING OF THE COMMISSIONER**

## I.  INTRODUCTION

On January 13, 2011, Plaintiff Leslie A. Ashby ("Plaintiff"), by counsel Jonathan C. Bowman, Esq., filed a complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1)  On March 18, 2011, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 8; Administrative Record, ECF Nos. 9-10)  On April 15, 2011, and May 18, 2011, the Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.

(Pl.'s Mot. for Summ. J., ECF No. 13; Def.'s Mot. for Summ. J., ECF No. 16)  Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

A.    Procedural History

On December 6, 2007, the Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability beginning June 1, 2006.  (R. at 123-34)  Both claims were initially denied on March 19, 2008, and denied again upon reconsideration on July 11, 2008.  (R. at 60-63)  On August 5, 2008, the Plaintiff filed a written request for a hearing, which was before United States Administrative Law Judge ("ALJ") Karl Alexander on September 17, 2009.  (R. at 86-87, 31-58)  The Plaintiff appeared in person and Lawrence S. Ostrowski, Ph.D., an impartial vocational expert, also appeared at the hearing.  (R. at 13, 31-58)  On October 22, 2009, the ALJ issued an unfavorable decision to the Plaintiff, finding that she was not disabled within the meaning of the Social Security Act.  (R. at 13-26)  On November 24, 2010, the Appeals Council denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-5)  The Plaintiff now requests judicial review of the ALJ's decision denying her application for disability.

B.    Personal History

Leslie A. Ashby was born May 3, 1972, and was 35 years old at the time she filed her DIB and SSI claims.  (R. at 123)  She received her GED in 1999 and has prior work experience as a

nursing assistant and a medium to heavy laborer on a factory assembly line. (R. at 201, 205) She

is divorced and has no dependent children. (R. at 128) She currently lives by herself in a friend's

home, who works out of town and only visits for about one month per year. (R. at 124)

C.    Medical History

The Plaintiff was treated at Wheeling Hospital on June 1, 2006, for a right elbow and forearm

laceration that occurred while working. (R. at 305) She hit her elbow and forearm against a piece

of metal. Id. She was examined by an ER physician, given an X-Ray, her wounds were cleaned and

sutured, and she was discharged with instructions to report any sign of infection. (R. at 306) An

ER followup report from June 1, 2006, states that the Plaintiff was released to return to work the

next work day, with restrictions on use of her right upper extremity. (R. at 311)

The Plaintiff visited Dr. Milton on June 5, 2006, to have her right upper extremity injuries

evaluated. (R. at 554-555) She had slow but full extension of the elbow, but had discomfort with

extension of the wrist. (R. at 554) The strength of her wrist extenders was 3/5. Id. There were no

sensory decreases into the dorsum or palmar surface of the hand, and her grip strength was adequate.

Id. X-Rays taken at the ER showed no bony abnormalities. Id. Dr. Milton gave her wound care

instructions and a return to duty order with restriction of movements of her right upper extremity.

(R. at 555)

On June 12, 2006, the Plaintiff visited Dr. Milton for a physical examination of her arm. (R.

at 313-314) She reported decreased ranged in motion with increased pain. (R. at 313) Dr. Milton

noted some warmth around the laceration and that she would only actively extend her elbow to

minus 25 degrees, but he found her radial pulse to be intact, her capillary refill to be adequate, and found no evidence of sensory loss.  Id.  There was some extensor tendinopathy, so Dr. Milton recommended an MRI.  Id.  The Plaintiff also made an appointment with an orthopedic specialist. (R. at 314)

The Plaintiff visited Dr. Milton's office on June 20, 2006, with continued swelling and discomfort in her right elbow, hand, and forearm, as well as problems with extending and flexing her right index finger.  (R. at 548)  Upon examination, the Plaintiff was actively able to extend her elbow to approximately -15 degrees, with flexion of 100 degrees.  (R. at 549)  She was able to have full opposition to all phalanges in her right hand.  Id.  Dr. Milton determined she was unable to return to work, but that her condition had improved to where an MRI could possibly be conducted. Id.

A physician's note from Dr. Marra, dated June 23, 2006,[1] states that, although the X-rays continued to be unremarkable and that the Plaintiff's arm was grossly intact neurovascularly, she continued to have pain in the elbow and difficulty flexing her index finger.  (R. at 315)  Dr. Marra wanted an MRI, and he prescribed Percocet for the Plaintiff to take before the procedure because a previous MRI attempt was unsuccessful due to pain.  Id.  Dr. Milton also evaluated the Plaintiff on June 23, 2006, finding extensor tendinopathy and probable secondary flexor weakness of the index finger.  (R. at 574)  She had only -35 degrees extension and 110 degrees flexion in her elbow,

---

[1] The office note erroneously states that the office visit occurred on June 23, 2003.  The Plaintiff's injury occurred in 2006, and a date of injury of June 1, 2006, is clearly written on the form.

and when she attempted to grip she had a decrease in flexion of the MCP and IP joints in her index finger.  Id.

On July 1, 2006, the Plaintiff underwent an MRI of her right elbow, which revealed bone marrow signal changes in her humerus and radius, lateral epicondylitis, small joint effusion, and some osteoarthritis in the medial aspect of the joint.  (R. at 493)  The bone marrow changes were deemed a nonspecific finding that should be correlated with laboratory testing and a bone scan to accurately diagnose the cause.  Id.

The Plaintiff visited Dr. Milton on July 7, 2006, for a followup examination of her elbow, arm, and hand.  (R. at 577-78)  Dr. Milton found extension to only -35 degrees and flexion of 110 degrees in the elbow, decreased flexion in the right index finger, and decreased pronation and supination due to discomfort in the lateral aspect of the right elbow.  (R. at 577)

On July 14, 2006, the Plaintiff was seen by Dr. Milton, who determined that although her puncture wound had healed, she had persistent lateral elbow pain with imaged joint effusion, posttraumatic tendonitis of the extensor group at the elbow, evidence of weakness in her grip secondary to a compensatory extensor tendinopathy, abnormal bone marrow, and possible peripheral neuropathy.  (R. at 571)

The Plaintiff visited Dr. Milton for an evaluation on July 24, 2006.  (R. at 560)  The Plaintiff had recently been denied physical therapy because her only diagnosis was of a laceration; however, Dr. Milton stated that, from his evaluations and the opinions of other consultants, it was evident that there was "more involved here."  Id.  She continued to have active extension to only -15 degrees and pain in flexion beyond 100 degrees in her arm, as well as weak flexion and extension in her index

finger.  Id.

Dr. Milton examined the Plaintiff on August 7, 2006, finding a persistent decrease in range of motion of the elbow due to lateral elbow pain and effusion and evidence of tendinopathy versus a peripheral neuritis.  (R. at 557)  She lacked full extension of the elbow, she had discomfort with flexion beyond 100 degrees, she had a decrease in extension of her index finger, and she had a weak grip.  Id.

On August 17, 2006, the Plaintiff presented to Dr. Milton with continued weakness in extension and flexion, but also complaints of paresthesias in the forearm and across her hand.  (R. at 565)  She had -25 degrees extension of her elbow, and no flexion beyond 100 degrees without discomfort.  Id.  She also had decreased pinprick sensation in her distal humeral area, the dorsum of her hand, and the web space between her thumb and index finger.  Id.  Dr. Milton thought she might be developing a chronic regional pain syndrome and requested a bone scan, an EMG, and an evaluation by orthopedist or upper extremity evaluator.  (R. at 566)

An examination conducted by Dr. Milton on August 24, 2006, found no change in the Plaintiff's extension, flexion, sensation, or finger strength.  (R. at 568)  Dr. Milton noted that a report from Dr. Marra stated that he was in a conundrum and had difficulty defining the cause of the Plaintiff's symptoms.  Id.

The Plaintiff was given a whole body bone scan on August 25, 2006.  (R. at 543-45)  No abnormalities of the bony skeleton were identified.  (R. at 543)

On August 29, 2006, Dr. Milton evaluated the Plaintiff and found that, despite a normal bone scan and continued physical therapy, her symptoms had not changed.  (R. at 562)  She continued to

have limited extension in her arm and weakness in her fingers.  Id.  She had persistent post injury weakness, ankylosis, and tenosynovitis.  Id.

Dr. Timms performed an EMG study of the Plaintiff's right arm on August 31, 2006.  (R. at 457)  He found that the right median motor nerve had normal latencies, amplitudes, and increased velocities.  Id.  The right ulnar motor nerve showed normal latencies, amplitudes, and velocities. Id.  The F-wave latencies were normal and symmetric.  Id.  The right ulnar sensory nerve was normal but the right median sensory nerve showed prolonged latencies and normal amplitudes.  Id. His impressions were right median motor nerve neuropathy and mild right median sensory nerve neuropathy.  Id.

A physical examination by Dr. Milton on September 7, 2006, showed that the Plaintiff had continued decreased range of motion in her arm, decreased supination, and decreased extension of her index finger.  (R. at 274)  Dr. Milton's impression was persistent arthralgia at the right elbow, posttraumatic; decreased range of motion that appeared to be more of a mechanical issue; and limited evidence of neurologic dysfunction, although the extension of the index finger and thumb may be related to peripheral posttraumatic neuropathy.  Id.  He reiterated with the Plaintiff that her elbow continued to be a dilemma and that her diagnosis remained obscure despite 12 weeks of treatment.  (R. at 275)

On September 18, 2006, Dr. Milton evaluated the Plaintiff and found that she had better extension at -15 degrees.  (R. at 580)  However, her supination was only 40 degrees, and she continued to have deceased flexion and extension in her index finger as well as decreased grip.  Id. Dr. Milton stated that the exact diagnosis was difficult to describe, but hoped that a consult with Dr.

Rytel would help.  (R. at 581)

Dr. Rytel, an orthopedic specialist, examined the Plaintiff's right elbow, forearm, and hand on October 5, 2006.  (R. at 322)  Dr. Rytel's examination revealed no sign of cellulitis or active infection, no increased skin temperature, and no point tenderness in the elbow or forearm.  Id. However, her skin had a slightly mottled appearance, she had diminished touch sensation along the radial aspect of her hand and forearm, she was unable to make a tight fist because her finger and thumb would not close, and she was tremulous in efforts at making an "okay" sign and with attempts at isolating weakness in her thumb's range of motion.  Id.  MRI results showed signal change in the region of her lateral epicondyle, and an EMG study showed delayed latencies in her median sensory nerves but without any focal motor nerve disruption.  Id.  Dr. Rytel diagnosed the Plaintiff with right forearm pain, numbness, and hand dysfunction of an unclear etiology, and stated that her symptoms were quite confusing.  Id.  He recommended that she not use her right upper extremity in work.  Id.

On October 12, 2006, Dr. Milton found that the Plaintiff continued to have swelling in her elbow, still could not fully extend her elbow, and could not extend her index finger.  (R. at 589-90) However, with assistance she would fully extend.  (R. at 590)  Her grip was decreased.  Id.

On November 1, 2006, the Plaintiff visited Dr. Milton, who found that she continued to be ankylosed at approximately 30 degrees, with continued weakness of flexion in her index finger.  (R. at 592)  Dr. Milton believed the Plaintiff to have a complex regional pain syndrome and prescribed Lyrica for pain.  (R. at 593)

The Plaintiff visited an orthopedic specialist, Dr. Ryu, on November 7, 2006, for examination of her hand, arm and elbow.  Dr. Ryu noted that the Plaintiff displayed very limited flexion and

extension of her elbow and forearm, and very weak finger motion in her index and middle finger. (R. at 498) However, Dr. Ryu was able to extend her elbow completely to full extension and complete flexion without too much pain, and felt that "[s]he was simply resisting, I believe, with range of motion examination." Id. Dr. Ryu stated that, after conducting a thorough examination of the Plaintiff, including her MRI results and X-Rays, he was unable to find a specific structural problem in her right upper extremity and did not know the etiology or source of her complaints of continued pain and weakness. Id.

Dr. Milton examined the Plaintiff on November 29, 2006, finding that the she maintained her elbow at 20 degrees of flexion, and active requests for more extension were fruitless; however, when asked to supinate, she seemed to extend her arm more actively. (R. at 496-97) The Plaintiff's attorney requested a causality for a diagnosis of reflex sympathetic dystrophy; however, no such diagnosis had been made, so Dr. Milton declined to assign causality. (R. at 497) Dr. Milton noted that, after three orthopedic assessments, no diagnosis had been made but the Plaintiff continued to have subjective complaints. Id. He suggested an independent medical evaluation be undertaken to help with the diagnosis. Id.

The Plaintiff visited Dr. Milton on December 27, 2006, who found continued right elbow pain and decreased range of motion both actively and passively. (R. at 595-96) She continued to have a weak grip and problems with her right index finger. Id. Dr. Milton noted that he was unable to place a diagnosis, and three orthopedic assessments have also failed to yield a good diagnosis. Id.

On January 18, 2007, Dr. Scheatzle performed an independent medical examination of the

Plaintiff.  (R. at 453-55)  After examining the Plaintiff and reviewing her medical records, Dr. Scheatzle opined that the Plaintiff was not yet at a static and stabilized point in her treatment; she could not return to her previous work; she was limited to lifting 10 pounds with her right arm and no pushing, pulling, or lifting above the shoulders with her right arm; she has not reached maximum medical improvement; her current treatment with Lyrica was appropriate, as was treatment with physical therapy; and she should receive work conditioning, range of motion strengthening, and vocational rehabilitation in an effort to transition her to a new work environment.  (R. at 454-55)

Dr. Milton evaluated the Plaintiff's elbow and hand on February 2, 2007, finding that the scar on her elbow had healed but she would only extend to 15 degrees and continued to have weakness in her fingers.  (R. at 276)  The Plaintiff reported pain whenever Dr. Milton would attempt to passively extend her elbow beyond 15 degrees.  Id.  Dr. Milton's impression was persistent complaints of elbow pain with decreased range of motion and ankylosis, and weakness of extension of her digit consistent with a potential radial neuropathy.  (R. at 277)  Dr. Milton stated that he was "at a loss to explain a diagnosis,"  and that her condition remained a dilemma.  Id.  Dr. Milton completed a disability status form on February 2, 2007, informing the Plaintiff's employer, Mayflower Systems, that she was unable to perform work activity of any kind as of the date of her injury.  (R. at 278)

A vocational rehabilitation evaluation form, completed on February 13, 2007, states that the Plaintiff drops glasses because of the numbness and weakness in her hand, and that she could not dress herself in anything except sweats.  (R. at 361)  She stated that she needed help from her neighbors to dress herself, including putting up her hair and tying her shoes.  Id.

The Plaintiff visited Dr. Milton on February 19, 2007, who found her symptoms to be unchanged. (R. at 301) He recommended a functional capacity evaluation be performed and rehab started. (R. at 301-02) Dr. Milton filled out a disability status form stating that the Plaintiff was unable to perform any work activity at that time. (R. at 303)

A workability functional capacity assessment, dated March 15, 2007, states that the Plaintiff's injury occurred when she was working on a metal press. (R. at 296) She was lifting a piece of scrap metal to place it in a hopper when her elbow scraped across another piece of scrap that was hanging out of a full hopper. Id. Her elbow began to bleed profusely, and when the bleeding did not stop she was asked to go to the emergency room. Id. She had been prescribed Lyrica for pain, but rather than taking it four times per day as prescribed she was taking it once a day due to drowsiness from the medication. Id. Her communication was normal and age appropriate, she was oriented to person/place/time, and her emotional/behavioral responses were all normal. (R. at 297) As far as pain, she reported a 5/10 as being her low, and 10/10 being the worst pain over the previous two weeks. Id. Her shoulder, wrist, elbow, thumb, and fingers were abnormal. Id. Her right grip was rated as very low, right side pinch as medium, right side arm lift as very low, right side shoulder as very low, and right forward pull was medium. (R. at 298) The exam found that the Plaintiff was not capable of performing any movements with her right upper extremity that involved vertical or horizontal reaching, supination or pronation, or any wrist movement. (R. at 299) All lifting and handling tasks must be performed with her left upper extremity, which is capable of performing many daily lifting and handling tasks. Id. She was not capable of performing any type of manipulation activities with her right hand. Id. Her right upper

extremity is limited to brief periods of assisting the left upper extremity to hold/stabilize objects. Id.

The Plaintiff visited Dr. Milton on March 23, 2007, for a followup, with the same subjective complaints and continued decrease in rage of motion in her right elbow and decreased grip strength in her right hand. (R. at 294) Dr. Milton noted warmth at the elbow, decreased range of motion, and decreased flexion and strength in the index finger, with no atrophy or discoloration of the skin noted. Id. Dr. Milton noted a functional capacity evaluation performed by Mark Basage, who found the Plaintiff's right upper extremity to be limited to only assisting the left. (R. at 294-95)

Noah Grey, an occupational therapist specializing in hand care, evaluated the Plaintiff on April 3, 2007. (R. at 440-42) Mr. Grey found that the Plaintiff held her elbow in 90 degrees flexion and that it was painful to extend. (R. at 440) Her wrist, index finger, and thumb were kept in a relaxed flexed position and she also had difficulty extending them. Id. She had slight radial nerve palsy in the thumb, index finger, and wrist, and was unable to actively extend her index finger or use her extensor pollicis. Id. She had very weak manual muscle test at wrist extension, very poor active supination, tight supination/pronation, and a stiff elbow that lacked extension. Id. She also had diminished range of motion in her shoulder. Id.

The Plaintiff visited Dr. Milton on May 1, 2007, informing him that she still could not fully extend her right elbow and still had weakness in her index finger. (R. at 434) Dr. Milton wanted her to continue working with a hand therapist. (R. at 435) He believed that a peripheral neuropathy had occurred in her upper extremity, and requested another EMG study. Id. He also recommended continued physical therapy. Id.

A physical therapy note from May 4, 2007, states that the Plaintiff continued to limit her right upper extremity use in therapy and wore a spring-loaded brace on her index finger. (R. at 338)

On May 17, 2007, the Plaintiff's physical therapist stated that the Plaintiff was continuing to self-limit with her right upper extremity unless she was cued verbally to use her hand. (R. at 524) She was able to tolerate full passive extension of the elbow, but still had some subjective pain close to the AC joint with overhead flexion past about 120 degrees. Id.

A physical therapy progress note dated May 24, 2007, states that the Plaintiff was less guarding and self limiting of her right upper extremity. (R. at 279) Mr. Frank Collelo, a rehabilitation counselor, wrote a letter to Dr. Milton on May 24, 2007, stating that the Plaintiff was making gains through exercise and the use of an E-Stim unit. (R. at 372) Mr. Collelo believed that the Plaintiff, with continued therapy, would regain the use of her index finger and thumb, and that she was able at that time to perform some of the activities of daily living that she was unable to perform before therapy. Id. Her physical therapist informed Mr. Collelo that the more she used her right arm the stronger it would become. Id. A vocational progress note dated May 14, 2007, states that, using both hands, the Plaintiff was able to lift 30 lbs from floor to wasite and approximately 15 lbs from waist to overhead. (R. at 382)

An EMG conducted by Dr. Timms on June 7, 2007, revealed only mild equivocal right carpal tunnel syndrome. (R. at 292) The right median and right ulnar motor nerve showed normal latencies, amplitudes, and velocities. Id. The right median sensory nerve showed borderline latencies and normal amplitudes. Id. The right ulnar and right radial sensory nerves were normal, the F-wave latencies were normal, and there were no abnormalities in the right deltoid, biceps,

triceps, first dorsal interosseous, or abductor pollices brevis.  Id.

Dr. Milton reported on June 12, 2007,[2] that the Plaintiff, through physical therapy, showed significant improvement in the range of motion of her elbow, with full passive extension.  (R. at 289) The function of her thumb was also significantly better, and although she had difficulty with active extension of her index finger, Dr. Milton noted that her index finger was improved.  Id.  His impression was persistent weakness reported in the right upper extremity, significant improvement of the elbow range of motion, and improvement of hand function.  (R. at 290) Dr. Milton stated that there appeared to be no neurologic dysfunction with regard to her fingers, and noted that an EMG study conducted by Dr. Timms found only mild median neuritis.  Id.  A plan note dated June 12, 2007, from the Plaintiff's case manager, states that she was having constant pain of 3-4/10 intensity, with that pain increasing to 6-7/10 if she tries to use her right arm.  (R. at 374)  She could almost straighten her index finger, her thumb was working, and she could almost straighten her elbow.  Id. She had begun looking for a job.  Id.

An adult patient profile assessment from July 5, 2007, states that the Plaintiff attempted to work and developed pain in her right shoulder and hand while using a nail gun and saw.  (R. at 282) She had numbness down to her index finger and redness in her shoulder, deltoid region, and right hand.  Id.

X-Rays taken on July 5, 2007, showed no fracture or malalignment in the right shoulder and

---

[2] The top of the report erroneously reports a date of June 12, 2006.  The end of the report states that the evaluation was given on June 12, 2007, and the report was transcribed on June 13, 2007.  Considering that Dr. Timms's EMG study did not occur until June 7, 2007, the date at the top of the report is clearly incorrect.

no bony abnormalities.  (R. at 626)

Dr. Ghaphery examined the Plaintiff on July 6, 2007, for the injury to her shoulder.  (R. at 405)  Dr. Ghaphery's notes state that, at the time the Plaintiff was injured, she was beginning her first full week of work without restrictions in over a year due to her previous elbow and arm injury. Id.  He observed that the Plaintiff was able to flex her index finger, and she informed him that she still receives physical therapy for her finger.  Id.  His impression was that she had a strained biceps, and he prescribed her Anaprox for pain and instructed her on icing her biceps.  Id.  She was to return to work but was restricted to sitting 6 hours, standing 4 hours, walking 4 hours, no pulling with her right hand, no crawling, and only occasional bending, squatting, and reaching.  (R. at 406)

Dr. Ghaphery examined the Plaintiff on July 19, 2007, for a followup on a right sided biceps strain.  (R. at 323)  She continued to have pain in physical therapy, but felt she was making some improvement.  Id.  She was instructed to continue with physical therapy and continue icing her arm. Id.  Dr. Ghaphery cleared her to return to her previous work but restricted her to sitting for 6 hours per day, standing 4 hours per day, walking 4 hours per day, no pushing and pulling with her right upper extremity, no crawling, and occasional bending, squatting, and reaching.  (R. at 325)  These restrictions were expected to last until August 12, 2007.  Id.

The Plaintiff's physical therapist wrote in a July 26, 2007, progress note that the Plaintiff stated she was feeling much better overall, with her subjective complaints of pain ranging from a 0 to 4, with 4 primarily with just overhead activities.  (R. at 510)  She had no instabilities with clavicular stress or AC stress, and had good strength and range of motion in all directions other than overhead.  Id.

On August 2, 2007, Dr. Ghaphery examined the Plaintiff's right shoulder. (R. at 610) Dr. Ghaphery reported that her shoulder showed improvement, and that her physical therapy goals had been met in regard to range of motion, but that she still had some discomfort over the acromioclavicular area. Id. Her shoulder range of motion was symmetrical, her rotator cuff strength was improved and appeared to be symmetrical, and she appeared to be ligamentously stable. Id. Dr. Ghaphery filled out a form releasing the Plaintiff to return to job placement services to find a new job that did not require heavy manual labor. Id. She was released without restrictions as of August 6, 2007. Id.

Dr. Milton examined the Plaintiff on August 13, 2007, finding that she had extension to -5 degrees in her elbow, no tenderness in the forearm, and no gross neurosensory loss. (R. at 612) She did, however, have increased flexion in her index finger compared to her other digits at rest, and would not fully extend her index finger at the PIP or DIP joint or fully flex for apposition. Id.

The Plaintiff underwent an MRI arthrogram of her right shoulder on December 3, 2007, which revealed no abnormality. (R. at 330) The MRI also showed no evidence of a rotator cuff tear or glenoid labral tear. (R. at 331)

Dr. Ghaphery examined the Plaintiff on December 10, 2007, for right shoulder pain. (R. at 328) Dr. Ghaphery believed her shoulder pain to be related to biceps tendinitis, and he sent her to physical therapy with instructions to continue icing her biceps. Id.

Dr. Sella, a state agency medical consultant, examined the Plaintiff on February 12, 2008. (R. at 679-81) Dr. Sella found that most of the Plaintiff's issues were of a psychiatric nature, but that her behavior in the office did not show any kind of abnormality in terms of a psychiatric

disorder.  Id.  As far as her physical issues, her right arm and hand problems were caused by work injuries.  Id.  She has bicipital tendonitis, difficulty with complete extension of the right elbow, and right index finger flexion problems.  Id.  She had reduced grip strength in her right hand, and Dr. Sella noted that the grip test was performed in a "non-physiologic fashion."  Id.  She did not use much right upper limb during the exam, and Dr. Sella found the range of motion problem to be "incredible."  Id.  In regard to work function, Dr. Sella found that the Plaintiff can sit, stand, walk, and lift/carry with her left upper limb.  Id.  She can handle objects with the left upper limb and she can speak, hear, and travel.  Id.  The upper right extremity needed to be re-examined after 6 months of treatment to find out if there is permanent damage to the arm, and the psychiatric allegations would need to be dealt with by a psychologist.  Id.

Dr. Gajendragadkar, a state agency medical consultant, completed a physical residual functional capacity assessment form on February 19, 2008.  (R. at 683-90)  Dr. Gajendragadkar found that the Plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand/walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and was limited in her upper extremities because she is right hand dominant with moderately-reduced range of motion in her right shoulder and elbow, severely limited right upper extremity and hand functions, and she is unable to use her right hand for any type of manipulation.  (R. at 684)  The Plaintiff could frequently climb ramps/stairs, balance, stoop, and kneel; occasionally crouch and crawl; and never climb ladders/ropes/scaffolds.  (R. at 685)  As far as manipulative limitations, she had unlimited feeling but limited ability to reach, handle, and finger due to right shoulder, elbow, hand, and finger limitations.  (R. at 686)  She had no visual or communicative limitations.  (R. at 686-87)  As far as

environmental limitations, the Plaintiff could have unlimited exposure to extreme heat, wetness, humidity, noise, and fumes; must avoid concentrated exposure to extreme cold and vibration; and avoid all exposure to hazards. (R. at 687) The Plaintiff's symptoms were found to be mostly credible, as supported by the medical evidence of record and the consultative evaluation report findings from Dr. Sella. (R. at 688) Dr. Gajendragadkar noted that the Plaintiff alleged some problems completing her personal care needs to due limitations in her right hand, but she was able to prepare meals and complete some household chores. (R. at 690)

On February 22, 2008, Dr. Krieg, a state agency psychological consultant, evaluated the Plaintiff's mental condition. (R. at 691-96) The Plaintiff was assessed via a clinical interview, mental status examination, and the administration of the WAIS-III and WRAT-4 tests. (R. at 691) She appeared at the interview casually dressed, with adequate grooming. Id. She attended the examination alone after driving herself a distance of 40 miles in one direction. Id. The Plaintiff reported a long history of sexual abuse and rapes during her childhood, as well as abusive relationships as an adult. (R. at 692-93) She reported that she is paranoid around people, and has to be home by dark because she is fearful for her safety. (R. at 693) Sh8e reported racing thoughts, constant pacing, hypervigilance at night, poor concentration, and imagining voices/sounds. Id. She reported having sleeping disturbances, daily crying episodes brought on without reason, accelerated energy accompanied by pacing, an irritable mood, and a suicide attempt several years earlier when her children were taken away and her parental rights terminated. Id. She reported no phobias, panic attacks, obsessions, or compulsions. Id. Dr. Krieg noted that the Plaintiff was cooperative, courteous, and motivated; her speech was relevant and coherent; and she was oriented to time,

place, person, and circumstance. (R. at 694) Her mood was anxious and irritable but she did not cry during the evaluation; her affect was broad; her concentration was within normal limits; her though processes were within normal limits; and she displayed no evidence of delusions, obsessions, compulsions, illusions, or hallucinations. (R. at 694-95) Her insight was adequate, her psychomotor activity was within normal limits, her judgment was poor, her immediate memory was normal, recent memory was markedly deficient, and her remote memory was within normal limits. (R. at 695) Dr. Krieg diagnosed the Plaintiff with posttraumatic stress disorder and a personality disorder not otherwise specified with borderline and dependant features. Id. Her prognosis was poor since she had not had any recent psychological treatment. Id.

Dr. Roman, a state agency consultant, completed a psychiatric review technique form on March 19, 2008, finding that the Plaintiff suffered from an anxiety-related disorder characterized by recurrent and intrusive recollections of a traumatic experience and a personality disorder not otherwise specified. (R. at 697, 702, 704) Dr. Roman found that she had a mild degree of resctrion in her activities of daily living, moderate limitations in maintaining social functioning and moderate limitations in maintaining concentration, persistence, or pace. (R. at 707) She had not suffered from an episode of decompensation of an extended duration. Id. The evidence of record did not establish the presence of the "C" criterion for Listing 12.06 (anxiety-related disorders). (R. at 708) Dr. Roman did find the Plaintiff to be credible based on the medical evidence of record and accounted for her credible complaints in an accompanying mental residual functional capacity assessment. (R. at 709)

Also on March 19, 2008, Dr. Roman completed a mental residual functional capacity

assessment of the Plaintiff.  (R. at 711-14)  The Plaintiff's memory was moderately limited in her ability to understand and remember detailed instructions.  (R. at 711)  Her concentration and persistence was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday/workweek without interruptions from psychologically-based symptoms or perform at a consistent pace without an unreasonable number and length of rest periods.  (R. at 711-12)  She was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors.  (R. at 712)  Dr. Roman noted that although the Plaintiff had an abusive childhood, she seemed to be coping well in spite of that abuse – she was not in psychiatric treatment, she obtained her GED, she worked in home health care for 10 years and in a factor for 5 years, and she remained independent in her activities of daily living and appeared able to perform routine work can accommodate her physical limitations.  (R. at 713)

Dr. Kuzniar, another state agency psychologist, examined Dr. Roman's findings and affirmed them as written.  (R. at 715)

Dr. Sarpolis, a state agency medical consultant, submitted a physical residual functional capacity assessment on July 11, 2008.  (R. at 716-23)  Dr. Sarpolis found the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull without limitation.  (R. at 717)  She could never climb ladders/ropes/scaffolds or crawl.  (R. at 718)  She was limited in her manipulative abilities due to problems in her right upper extremity.  (R. at 719)  She had no visual, communicative, or environmental limitations.  (R. at 719-20) Dr. Sarpolis found that medical source

statements about the plaintiff's back, left upper extremity, and lower extremities were consistent with the medical evidence in the file and fully controlling in his RFC assessment. (R. at 723) However, the RFC as to her righter upper extremity limits were reflected in her physical exam and other medical history, as medical source statements in this area were speculative. Id.

On May 27, 2009, the Plaintiff was given a psychological evaluation by Dr. Cerra. (R. at 734-44) The Plaintiff was evaluated via a clinical interview, a mental status examination, and the following clinical assessments: the WAIS-III, WRAT-4, BAI, BDI-II, and MMPI-II (R. at 734) The Plaintiff reported being the victim of sexual abuse, rape, and domestic violence as both a child and a young adult. (R. at 735) She stated that she is "never happy," and has mood swings along with a "short fuse." (R. at 736) She reported past and current symptoms of anxiety related to recollection of past traumatic events, and further reported that she "doesn't like crowds" and does any needed shopping at 3:00 to 4:00 AM. Id. She denied hallucinations and delusional thinking, but stated that she was "paranoid," didn't like being around people, and had a fear of heights and bugs. (R. at 738) Dr. Cerra observed that the Plaintiff was cooperative, pleasant, and dressed appropriately. (R. at 737) She was oriented to time, place, person, and circumstance. Id. She was talkative and her speech was coherent and relevant. Id. She had normal psychomotor movement, maintained adequate eye contact, had a relaxed body posture, and did not display an elevated anxiety level. Id. Her immediate, recent, and remote memory processes appeared to be impaired because she could repeat three words immediately after presentation but could only remember two of the three words when asked at a later time. Id. Dr. Cerra noted that her mood and affect appeared to be depressed, but she denied suicidal/homicidal ideation. (R. at 738) The Plaintiff's full scale IQ, as determined

by the WAIS-III, was an 80, which fell into the 9th percentile. (R. at 739) Dr. Cerra stated that there was a 95% confidence that the Plaintiff's true IQ score fell within a range of 76-84. Id. The Plaintiff's scores on the WRAT-4 were similar to her scores on the WAIS-III; Dr. Cerra, therefore, found that the Plaintiff may have difficulty with learning and retaining new information. (R. at 740-41) The Plaintiff's self-reported scores on the BAI indicated that she was experiencing moderate symptoms of anxiety, and a combination of objective and subjective scores on the BDI-II indicated that she was experiencing severe symptoms of depression. (R. at 741) The Plaintiff's MMPI-II results indicated that she may have attempted to present herself in a negative fashion. (R. at 741) Dr. Cerra assessed a GAF score of 45 and diagnosed the Plaintiff with major depressive disorder, recurrent, severe, without psychotic features; posttraumatic stress disorder; social phobia; and an anxiety disorder, not otherwise specified. (R. at 742)

E.    Testimonial Evidence

At the ALJ hearing on September 17, 2009, the Plaintiff testified that she used to be able to lift 100 pounds by herself, lifting objects over 50 pounds for many of her previous jobs. (R. at 37) She previously worked as a veteriniary assistant, a nurse's aide, a bricklayer, a forklift operator, a machine operator at a plastics factory, a line worker at a food processing plant, and a stamping machine operator at a truck manufacturing facility. (R. at 37-42) Most of these jobs were obtained through a temp service. (R. at 41)

While working as a stamping machine operator, the Plaintiff was injured by a piece of scrap metal that cut through her right elbow and severed some nerves. (R. at 42) Her thumb and index finger on her right hand do not straighten, and she cannot create a fist with that hand. (R. at 42-43)

She cannot use her right hand for much of anything – she cannot do dishes, sweep the floors, or write.  (R. at 43)  She has a lot of pain, which runs from her elbow, to her knuckles and into her finger joints.  Id.  She has constant pain, and cannot afford pain medication other than ibuprofen.  (R. at 44)  On a scale of ten, her pain is constantly a six or seven, but she has episodes on a weekly basis where the pain reaches a ten and stays that intense for a day or two.  (R. at 45)  When the pain reaches a ten, she cannot do much of anything except pace around; she cannot sit, lay down, or do much of anything.  (R. at 45-46)  She has not had surgery to correct the problem.  (R. at 42-43)

The Plaintiff can lift things like pens with her right arm and hand, but cannot lift anything with weight.  (R. at 46)  She testified that she uses her right hand to balance items she lifts with her left hand; for example, if she were to lift a 5-pound bag of sugar, she lifts with the left hand but uses three fingers on her right hand for balance.  Id.  She can reach overhead with her right arm.  Id.

The Plaintiff claims to have been diagnosed with some mental disorders, but does not know the diagnoses or what they mean.  (R. at 47)  She has been seeking some mental health counseling, but is not taking medication because she cannot afford to fill her prescriptions.  (R. at 47-48)  She doesn't like crowds or having people behind her, and won't go to a place like Wal-Mart.  (R. at 50)  She does her grocery shopping at 2 to 3 o'clock in the morning.  Id.  She does not like to work around others, and prefers to be left alone to do her job.  (R. at 51)

The Plaintiff does not own or drive a vehicle, but could drive short distances if she had access to one.  (R. at 48)  She can write with her right hand, but it does not look good.  Id.  She can do household chores such as dishes, laundry, and cleaning, but they are difficult.  (R. at 49)  She lives in a small efficiency apartment, and she takes care of her chores as best she can.  Id.

F.    Vocational Evidence

Larry Ostrowski, an impartial vocational expert, also testified at the ALJ hearing on September 17, 2009.  (R. at 51-57)  Mr. Ostrowski began his testimony by describing the Plaintiff's past relevant work as follows:

•    press operator, medium and semiskilled;

•    nursing assistant and home health aide, medium and semiskilled;

•    animal caretaker/veterinary assistant, medium and semiskilled;

•    bricklayer, heavy and skilled;

•    industrial truck operator, medium and semiskilled;

•    hand packager, medium and unskilled; and

•    blow mold machine tender, light and unskilled.

(R. at 53-54)  The ALJ then posed the following hypotheticals to Mr. Ostrowski, who answered them in terms of a local economy based upon the Wheeling/Bridgeport Metropolitan Statistical Area combined with 10% of the jobs in the State of Ohio and the Pittsburgh Metropolitan Statistical Area:

> Q.    Then, let me ask you to assume a hypothetical individual of the claimant's age, educational background, and work history, who would be able to perform a range of sedentary work; could perform postural movements occasionally, except could not climb ladders, ropes, or scaffolds.  The use of the right upper, dominant right upper extremity would be limited to functioning as a helper hand, with the left upper extremity not being impaired.  This person should work in a low-stress environment, with no production line or assembly line type of pace or independent decision-making responsibilities; would be limited to unskilled work involving only routine and repetitive instructions and tasks, with no more, with – involving no more than say, fifth- to seventh-grade reading and math tasks; should have no interaction with the general public, minimal – no more than occasional action with coworkers and supervisors.  Would there be any work in the

regional or national economy that such a person could perform?

A.    Yes, Your Honor, . . . There would be the work of a surveillance system monitor. In the local economy, there are 73 jobs; in the national economy, 25,366 jobs. There would be the work of a table worker. In the local economy, there are 68 jobs; in the national economy, 10,110 jobs.

(R. at 54-55) The Plaintiff's attorney then posed two additional hypotheticals to Mr. Ostrowski:

Q.    Dr. Ostrowsky, I, I only have two questions. With respect to hypothetical number one, if I were to also give you an additional limitation, and that limitation is that the claimant would be absent from work four days per month, based upon her testimony that she has severe pain at a 10 level that lasts at least for a day of duration once a week, if I were to provide you with that additional restriction under hypothetical number one, would that affect the jobs you've identified? And if so, how?

A.    Yes. It's my experience that if an individual were to be absent / late for work / have to leave work, more than two times a month on an ongoing basis, they will lose their job.

Q.    With respect to hypothetical number one, I was going to give you a different restriction this time. This time, it would be that the hypothetical individual would be off task – and I will be referencing the May 27, '09 report from Dr. Dick Sarah's (Phonetic) office, completed by a psychologist, Karen Campbell, who provided a global assessment of functioning of 45. The, the restriction is that the hypothetical person would be off task 20% or more of the time in the average working day. Would that affect the jobs you've identified? And if so, how?

A.    Yes. If an individual were off task 20 percent of a work period, there are studies that show that – that have been done, that would indicate a person would be off task up to 10 percent, and it would not affect their productivity in, in terms of keeping their job. So, if an individual were off task 20 percent of a work period, they would generally lose their job.

(R. at 56-57)

G.    <u>Lifestyle Evidence</u>

On an Adult Function Report dated January 8, 2008, the Plaintiff reported that she spends

her time watching television or listening to the radio. (R. at 208) She has a dog, which she feeds twice a day, plays with by rolling a ball, lets outside to use the bathroom, and on nice days will sit outside with it. (R. at 209, 216) She prepares meals every day, usually making sandwiches or hamburgers or using a crockpot. (R. at 210, 216) She can clean and do laundry left handed, which she usually does once or twice a week for 1-2 hours. (R. at 210, 218) She does not need help or encouragement to do her laundry or to clean. (R. at 210, 218)

For personal care, the Plaintiff needs to wear clothes that she does not have to button or zip. (R. at 209) She bathes, cares for her hair, shaves, and feeds herself with her left hand only. Id. She does not need special reminders to take care of herself or to take medication. (R. at 210)

The Plaintiff goes outside "a lot," which her friend, Susan Marsh, stated was daily. (R. at 211, 219) She can drive a car, and when she goes out she can do so alone. Id. She shops in stores for groceries once a month, but she must go very slow and cannot lift heavy items. Id.

As far as her finances, the Plaintiff can count change with her left hand, but cannot pay bills, handle a savings account, or use a checkbook. (R. at 211) She stated that she cannot do those things because she has no income, no savings, and no checkbook. Id. Her friend, Susan Marsh, stated that the Plaintiff can pay bills, count change, handle a savings account, and use a checkbook/money order. (R. at 219)

The Plaintiff likes to draw, do arts and crafts, and lift weights. (R. at 212) She can no longer draw or make crafts because she is right-handed, and she cannot lift weights with her right hand. Id. The Plaintiff claims that she does not spend time with others, and does not go anywhere on a regular basis. Id. However, her friend, Susan Marsh, stated that she visits the Plaintiff twice a week,

and that the Plaintiff spends time with others on a daily basis to talk and eat. (R. at 216, 220)

H.     Other Evidence

A letter dated July 1, 2008, from Kevin W. Bench, district hearing officer for the Industrial Commission of Ohio, states that the Plaintiff was found to qualify for 6% of permanent partial disability, entitling her to an award of compensation for a period of 12 weeks. (R. at 724) The award was made for the Plaintiff's claim of right shoulder strain and right biceps strain stemming from an injury incurred on July 5, 2007. Id.

## III.  CONTENTIONS OF THE PARTIES

The Plaintiff, in her motion for summary judgment, alleges that the ALJ's ruling is not supported by substantial evidence. (Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. 8, ECF No. 13) In support of her motion, the Plaintiff specifically argues that:

•     the ALJ committed reversible error by giving "great weight" to the psychiatric review technique form assessments provided by non-evaluating psychologists while discounting the report of an examining physician;

•     the ALJ erred in determining that the Plaintiff has the residual functional capacity to use her right upper extremity;

•     the ALJ's residual functional capacity erroneously evaluated her mental capabilities; and

•     the ALJ did not correctly assess the Plaintiff's credibility.

Id. at 8-12. The Plaintiff requests that the Court reverse the decision of the Commissioner and award benefits or, alternatively, remand this matter for a new hearing. Id. at 5-6.

The Defendant alleges in his motion for summary judgment that the decision denying the

Plaintiff's claims is supported by substantial evidence and should be affirmed as a matter of law.

(Def.'s Mot for Summ J.1, ECF No. 16)  Specifically, the Defendant argues that:

•       substantial evidence supports the ALJ's residual functional capacity assessment; and

•       substantial evidence supports the ALJ's credibility determination.

(Comm'r's Br. in Supp. of His Mot. for Summ. J. 10-14, ECF No. 17)

## IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  <u>See</u> 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); <u>Richardson v. Perales</u>, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. at 401, 91 S. Ct. at 1427 (citing <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."  <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence.  <u>See</u>  <u>Laws v. Celebrezze</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962).

<u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case <u>de novo</u> when reviewing disability determinations."  <u>Seacrist v. Weinberger</u>, 538 F.2d 1054, 1056-57 (4th Cir. 1976).   Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported**

by **'substantial evidence.'"** <u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis

added).

## V. DISCUSSION

A.      <u>Standard for Disability and the Five-Step Evaluation Process</u>

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

<u>See</u> 42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. § 404.1520.]

(iv) At the fourth step, we consider our assessment of your residual functional

capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520. If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. Id.

B.    The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

**1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.** (R. at 15)

**2.    The claimant has not engaged in substantial gainful activity since June 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).** (R. at 15)

**3.    The claimant has the following severe impairments: impairment to the right upper extremity resulting in limitation of function to use as a helper hand/reflex sympathetic dystrophy; major depressive disorder/posttraumatic stress disorder/anxiety disorder/social phobia; and personality disorder with borderline dependent features (20 CFR 404.1520(c) and 416.920(c)).** (R. at 16)

**4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).** (R. at 16)

**5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform**

sedentary work as defined in **20 CFR 404.1567(a) and 416.967(a) with certain modifications. She may perform postural movements occasionally except may not climb ladders, ropes and scaffolds; is limited to using the right upper extremity only as a helper hand but has no limitations for the left hand; should work in a low stress environment with no assembly line type of pace and no independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive tasks with no more than fifth to seventh grade reading and mathematical requirements; and should have no interaction with the general public and minimal, no more than occasional, interaction with coworkers and supervisors.** (R. at 18)

6. **The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).** (R. at 25)

7. **The claimant was born on May 3, 1972, and was 34 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).** (R. at 25)

8. **The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).** (R. at 25)

9. **Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).** (R. at 25)

10. **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).** (R. at 25)

11. **The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).** (R. at 26)

C. <u>The ALJ's Evaluation of the Plaintiff's Mental Impairments is Supported by Substantial Evidence</u>

As her first assignment of error, the Plaintiff argues that the ALJ improperly afforded "great

weight" to two psychiatric review technique form assessments, dated March 19, 2008, and June 19, 2008, while discounting the opinion of Dr. Cerra. (Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. 8, ECF No. 13) The Plaintiff also raises a host of other objections to the ALJ's evaluation of the Plaintiff's mental impairments, including objections to aspects of the ALJ's RFC as well as the hypothetical questions posed to the vocational expert ("VE"). See id. at 10-11. In response, the Defendant argues that the ALJ did not solely rely upon the psychiatric review technique forms in formulating the Plaintiff's RFC, adequately accounted for Dr. Cerra's findings in his RFC determination, and committed no error in his questioning of the VE. (Comm'r's Br. in Supp. of His Mot. for Summ. J. 10-14, ECF No. 17) After reviewing the record and the parties' motions, the undersigned finds that the Plaintiff's objections are without merit.

1. <u>Dr. Cerra is Not a "Treating Source" So His Opinion Is Not Entitled to Controlling Weight</u>

As a threshold matter, Dr. Cerra is not a "treating source" as defined at 20 C.F.R. §§ 404.1502 or 416.902. The regulations define a "treating source" as follows:

> *Treating source* means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. . . . **We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.** In such a case, we will consider the acceptable medical source to be a non-treating source.

20 C.F.R. §§ 404.1502, 416.902 (2010) (emphasis added). As is clearly stated in the written evaluation, Dr. Cerra's opinion was provided not as part of a regular mode of treatment but instead as part of the evaluation process for the Plaintiff's disability claim: "[t]his evaluation was requested

by Belmont County Department of Job & Family Services for Ms. Ashby in order to determine employability or disability." (R. at 736) The undersigned Magistrate Judge thus finds that Dr. Cerra's opinion is not entitled to controlling weight under 20 C.F.R. §§ 404.1527(d)(2) or 404.927(d)(2) and carries no greater significance than that of an opinion from any other medical source of record.

2.    The ALJ Gave A Proper Explanation For the Reasons He Assigned Controlling Weight to the Opinions of the State Agency Psychological Consultants

Considering that Dr. Cerra's opinion is not a "treating source" opinion, the ALJ gave proper reasons for assigning great weight to the opinions of the state agency psychological consultants. The regulations provide a list of factors that the ALJ considers in determining the weight to afford opinion evidence, including: 1) examining relationship, 2) treatment relationship, 3) supportability, 4) consistency, 5) specialization, and 6) other factors, including "the amount of understanding of our disability programs and their evidentiary requirements." 20 C.F.R. §§ 404.1527(d), 416.927(d) (2010). The ALJ clearly considered these factors, emphasizing in his notice of decision the supportability and consistency of the state agency opinions with the medical evidence of record as well as the expertise of the evaluators in evaluating disability claims:

> [i]n so finding, great weight is given to the psychiatric review technique form ("PRTF") assessments by the reviewing psychologists dated March 19, 2008, [R. at 697-714] and June 19, 2008, [R. at 715] . . . . The PRTF assessments are given great weight because they are well reasoned and fully supported by the longitudinal medical evidence of record as discussed in the consultant's notes on the mental residual functional capacity assessment (Exhibit 8F). [R. at 709] Furthermore, the PRTF assessments are given by mental health specialists who have an understanding of the disability programs and their evidentiary requirements.

(R. at 17-18) Although the ALJ did not specifically mention Dr. Cerra's opinion in this section of

his analysis, the Defendant correctly points out that the state agency opinions were only assigned great weight in determining whether the Plaintiff's mental impairments were severe and/or met or medically equaled a Listing: "[t]he limitations identified in the 'paragraph B' criteria **are not a residual functional capacity assessment** but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." (R. at 18) (emphasis added) Additionally, as discussed <u>infra</u>, the ALJ provided a thorough discussion of Dr. Cerra's findings at subsequent steps of the disability process and, in fact, incorporated Dr. Cerra's findings into his RFC determination. Therefore, the undersigned Magistrate Judge finds that substantial evidence supports the weight afforded to the opinions of the state agency psychological consultants.

3.      <u>The ALJ Provided a Thorough Discussion of Dr. Cerra's Findings and Incorporated Those Findings Into His RFC Determination</u>

Contrary to the Plaintiff's assertions, the ALJ did, in fact, discuss Dr. Cerra's findings and incorporated them into his RFC determination. "[A]lthough an ALJ has no duty to comment on every piece of evidence or testimony presented, he or she must articulate some minimal analysis of the evidence to enable the reviewing court to track the ALJ's reasoning and be assured that the ALJ considered the most important evidence." <u>Lilly v. Astrue</u>, No. 5:07CV77, 2008 WL 4371499, at *3 (N.D.W.Va. Sept. 22, 2008) (Stamp, J.) (quoting <u>Green v. Shalala</u>, 51 F.3d 96 (7th Cir. 1995)) (internal quotations omitted). In this case, the ALJ clearly fulfilled his duty of explanation, providing a lengthy and detailed discussion of Dr. Cerra's May 27, 2009, evaluation:

•      The ALJ first examined Dr. Cerra's clinical interview findings, noting that the Plaintiff's self-reported mental state conflicted with Dr. Cerra's observations about her demeanor and

ability to perform tasks at the evaluation. (See R. at 22-23)  The ALJ also noted that the Plaintiff's memory processes appeared to be impaired and her social judgment was assessed as below average, but her attention and concentration were commensurate with her age and ability, and her judgment and insight were found to be adequate.  (R. at 23)

•    The ALJ next recounted the Plaintiff's WAIS-III and WRAT-4 scores, as well as the results of her Beck Anxiety Inventory, Beck Depression Inventory, and MMPI.  (R. at 23)  The ALJ gave little weight to the Plaintiff's Beck Anxiety Inventory and Beck Depression Inventory because the results were based solely on the Plaintiff's self-report and her MMPI results indicated that she may have attempted to present herself in a negative fashion.  Id.

•    The ALJ noted that Dr. Cerra assigned a Global Assessment of Functioning ("GAF") score of 45, but that he gave little weight to that score because it was based on a one-time evaluation and the claimant's subjective allegations, and was contradicted by the Plaintiff's ability to live alone, manage her own household, and her demeanor and performance at the psychological assessment.  (R. at 23)

The ALJ then proceeded to incorporate portions of Dr. Cerra's findings into his RFC assessment:

> The undersigned has accommodated the claimant's moderate limitation in social functioning by limiting her to work that involves no interaction with the general public and minimal, no more than occasional, interaction with coworkers and supervisors.  **The claimant's moderate limitation in concentration, persistence and pace has been accommodated by limited her to unskilled work involving only routine and repetitive tasks with no more than fifth to seventh grade reading and mathematical requirements.**  Overall, the undersigned finds that these requirements are an adequate accommodation of the claimant's mental impairments.

(R. at 23-24) (emphasis added)  Although the Plaintiff would ask this Court to second guess the

ALJ's analysis of the evidence, it is the duty of the Commissioner, not the court, to resolve conflicts in that evidence and this Court will not substitute its judgment in place of a well-reasoned and thoroughly documented decision.  See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Accordingly, the undersigned Magistrate Judge finds that substantial evidence supports the weight given to Dr. Cerra's opinion by the ALJ.[3]

4.      Substantial Evidence Supports the Mental Limitations Posed to the Vocational Expert

Additionally, the Plaintiff objects to the ALJ's failure to explain the weight afforded to the VE's cross examination responses.  (Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. 10, ECF No. 13)  For a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989).  "While questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record."  Russel v. Barnhart, 58 Fed.App'x 25, 2003 WL 257494, at **5 (4th Cir. Feb. 7, 2003) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  The ALJ is free to accept or reject suggested restrictions in his questioning of a VE so long as there is substantial evidence to support the ultimate question.  Koonce v. Apfel, 166 F.3d 1209, 1999 WL 7864, at *5 (4th Cir. Jan. 11, 1999) (Table)

_____

[3] The undersigned notes that the Plaintiff devoted a separate paragraph of her brief to addressing the ALJ's finding that "she would have moderate limitations of concentration and attention and that those would be accommodated by the Plaintiff being limited to unskilled work that would be routine and repetitive in nature."  (See Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. 10, ECF No. 13)  The Plaintiff complains that this restriction fails to account for other "repeated statements identified in the records," yet fails to provide any specific references to those statements.  Regardless, this restriction stems directly from the ALJ's analysis of Dr. Cerra's findings and the undersigned finds, for the reasons identified supra, that the ALJ supported this restriction with substantial evidence.

(Per Curiam).  As discussed _supra_, the ALJ adequately supported his mental RFC limitations with substantial evidence, and the undersigned Magistrate Judge finds no error in the hypothetical submitted to the VE because that hypothetical accurately reflected the limitations found by the ALJ.

5.      The ALJ Properly Weighed the GAF Score Reported By Dr. Cerra

The Plaintiff also objects to the weight that the ALJ assigned to the global assessment of functioning ("GAF") score reported by Dr. Cerra.  (Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. 8-9, 11, ECF No. 13)  "The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) [DSM-TV-TR] at 32 . . . A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social occupational, or school functioning,' such as inability to keep a job.  _id_. [at 34]."  Pisciotta v. Astrue, 500 F.3d 1074, 1076 n. 1 (10th Cir. 2007).  However, the Social Security Administration has stated that the GAF scale "does not have a direct correlation to the severity requirements in [the social security] disorders listings."  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50764-65 (Aug. 21, 2000).  As noted by the ALJ, the GAF score assigned by Dr. Cerra was based only upon his one-time evaluation of the Plaintiff, and is contradicted by her activities of daily living as well as her demeanor and performance at the psychological evaluation.  (R. at 23)  Additionally, upon reviewing Dr. Cerra's report, the undersigned finds that no explanation was provided of the basis for the score assigned.  While a GAF score is relevant evidence, the ALJ is free to reject it if other contradictory evidence exists in the record, particularly where the examiner fails to provide adequate support for his

conclusion. See 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(e) (2010) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). As such, the undersigned Magistrate Judge finds that substantial evidence supports the weight assigned to Dr. Cerra's GAF score.

D.    Substantial Evidence Supports the Physical Limitations Identified In The ALJ's RFC

The Plaintiff next objects to the ALJ's determination that the Plaintiff is able to use her right hand, arguing that the ALJ's assessment is overstated because all of the objective evidence indicates that the Plaintiff is unable to use her right arm for any form of activity. (Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. 9-10, ECF No. 13) A claimant's residual functional capacity is the most she can do despite her limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2010). The ALJ's RFC assessment, to be supported by substantial evidence, must include a thorough discussion and analysis of the objective medical and other evidence, resolve any inconsistencies in the evidence as a whole, and set forth a logical explanation of the effects of symptoms, including pain, on the individual's ability to work. SSR 96-80, 1996 WL 374184, at *7 (July 2, 1996). In this case, medical evidence of record, opinion evidence, and statements from the Plaintiff herself all support the limitations found by the ALJ. First, the ALJ included in his discussion medical evidence that supported his assessment of the Plaintiff's right upper extremity:

•    An independent medical examination performed on January 18, 2007, found that the Plaintiff's right upper extremity strength was intact but that her grip strength was decreased at 4/5. (R. at 20)

- A consultative examination performed on February 12, 2008, found that the Plaintiff could fully extend her hands, make a fist, and oppose her fingers.  Her extremity strength and grip strength were reported as 4/5 on the right side.  (R. at 21)

Second, the ALJ cited medical opinion evidence that also supported his conclusion:

- An independent medical examiner that evaluated the Plaintiff on January 18, 2007, found that she could lift up to 10 pounds with the right arm but could not push or pull or lift above the shoulders.  (R. at 20)

- A functional capacity evaluation from March 23, 2007, found that the Plaintiff's right extremity was limited to brief periods of assisting the left.  (R. at 21)

Finally, the Plaintiff's own statements show that she is able to make some use of her right upper extremity to balance objects:

- In her disability application, the Plaintiff stated that she could lift no more than 10 pounds with her right upper extremity.  (R. at 19)

- At the hearing, the Plaintiff testified that she could not lift anything over five pounds with her right arm but that she used it as an assist to her left arm.  (R. at 19)

Specifically, in her testimony before the ALJ, the Plaintiff stated as follows:

Q.      Can you lift anything with your right, right arm or right hand?

A.      Simple things, like a pen, stuff like that.  I have trouble getting it off the table.  But the only thing I can tell you with that would be like if I get a 5-pound bag of sugar –

Q.      Um-hum.

A.      – I can't do it with this hand.  I have to use it for balance with these three –

Q.     Yeah, brace it –

A.     – fingers that work.  But –

Q.     – sort of.

A.     – most of it's from the left.

Q.     The lifting is from the left, yeah.  Can you reach overhead with your right arm?

A.     Over my head?

Q.     Yeah.  You can d that to some, to some extent.

A.     Um-hum.

(R. at 46)  Although the Plaintiff points to other evidence in the record which indicates that she could not use her right upper extremity, it is not the province of this Court to second-guess the Commissioner's weighing of the evidence when substantial evidence supports his decision.  The ALJ provided an adequate explanation of the limitations assigned, and evidence in the record supports his determination.  Accordingly, the undersigned Magistrate Judge finds that substantial evidence supports the physical limitations contained in the ALJ's RFC determination.

E.     <u>Substantial Evidence Supports the ALJ's Credibility Determination</u>

Finally, the Plaintiff objects to the ALJ's assessment of the Plaintiff's subjective complaints. (Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. 11, ECF No. 13)  As noted by the Defendant, "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court."  <u>Ryan v. Astrue</u>, No. 5:09CV55, 2011 WL 541125, at *3 (N.D.W.Va. Feb. 8, 2011) (Stamp, J.).  "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'"

Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D.W.Va. February 3, 2010) (Seibert, Mag.) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).  As noted by the Defendant, the Plaintiff provides no explanation for her assertion – her brief fails to provide any argument as to why the ALJ's ruling is incorrect, and fails to cite any evidence from the record that would support a different assessment of her credibility.  (See Mem. in Supp. at 11)  Regardless, the ALJ provided ample support for his decision to discount the Plaintiff's credibility, listing numerous contradictory statements as well as objective evidence that the Plaintiff exaggerated her symptoms:

- The ALJ noted that statements from a third party function report, completed by one of the Plaintiff's friends, contradicted the Plaintiff's statements as to the extent of her daily activities.  (R. at 19)

- An orthopedic consultant who examined the Plaintiff on November 7, 2006, noted that she claimed to have limited function of her arm but upon examination he was able to extend her elbow completely without much pain, noting that he believed she was simply resisting the examination.  He also found no evidence of any abnormalities in the right upper extremity, and made no diagnosis of reflex sympathetic dystrophy or chronic regional pain syndrome.  (R. at 20)

- An independent medical examiner reported on January 18, 2007, that the Plaintiff resisted his examination of her right arm.  He found no polyarthritic changes, heat, redness, swelling, or effusion.  (R. at 20)

- The Plaintiff reported on July 26, 2007, that she was feeling much better overall, with her only complaints involving the acromioclavicular joint during overhead activities.  However,

the Plaintiff did not return to work. (R. at 21)

- The Plaintiff reported on March 10, 2008, that she had to be home by dark due to fear, but later reported on May 27, 2009, that she does her shopping at 3:00 or 4:00 AM. (R. at 22)

- The Plaintiff, at a psychological evaluation on May 27, 2009, displayed intact fine and gross movements in her right hand, which contradicts her allegation that she could not perform any fine manipulation with that hand. (R. at 23)

- The Plaintiff's MMPI scores from May 27, 2009, indicated that she attempted to present herself in a negative fashion. (R. at 23)

Furthermore, after noting the above inconsistencies and finding the Plaintiff's subjective complaints at best unreliable and at worst untruthful, the ALJ went on to discuss activities of the Plaintiff's daily life which show that she was not as limited as she claimed. (See R. at 24) The undersigned Magistrate Judge, therefore, finds that substantial evidence supports the ALJ's credibility determination.

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that the Defendant's Motion for Summary Judgment (ECF No. 16) be **GRANTED**, the Plaintiff's Motion for Summary Judgment (ECF No. 13) be **DENIED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this **5th** day of **July**, **2011**.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE